UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GOLDINE L. FOSTER,

Case No. 13-10813

Plaintiff,

District Judge Arthur J. Tarnow

v.

Magistrate Judge R. Steven Whalen

COMMISSIONER OF
SOCIAL SECURITY,

Defendant.

_____/

## REPORT AND RECOMMENDATION

Plaintiff Goldine L. Foster brings this action under 42 U.S.C. §405(g), challenging a final decision of Defendant Commissioner denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act.   Parties have filed cross motions for summary judgment which have been referred for a Report and Recommendation pursuant to 28 U.S.C. §636(b)(1)(B).  For the reasons set forth below,  I recommend that Defendant's Motion for Summary Judgment be DENIED and that Plaintiff's Motion for Summary Judgment be GRANTED to the extent that the case be remanded for further administrative proceedings.

## I.   PROCEDURAL HISTORY

Plaintiff applied for DIB on October 10, 2007, alleging disability as of September 24, 2007 (Tr. 202-206).  Upon denial of the claim, Plaintiff requested an administrative hearing,

held on May 19, 2011 in Livonia, Michigan[1] (Tr. 30).  Plaintiff, represented by Bruce
Weider, testified (33-54), as did VE Luann Castellana (Tr. 54-61).  On June 24, 2011, ALJ
Perez found that Plaintiff was not disabled (Tr. 23).  On January 28, 2013, the Appeals
Council denied review (Tr. 1-5).  Plaintiff filed suit in this Court on February 28, 2013.

## II.   BACKGROUND FACTS

Plaintiff, born February 24, 1964, was 47 at the time of the administrative decision
(Tr. 23, 202).  She completed high school and (Tr. 288) worked previously as clerk and
patient care technician (Tr. 284).   Her application for benefits alleges disability as a result
of left side carpel tunnel syndrome ("CTS"), shoulder problems, and asthma (Tr. 284).

### A.  Plaintiff's Testimony

Plaintiff offered the following testimony:

She could read, write, and perform calculations (Tr. 33).  She worked at St. Joseph's
Mercy Hospital from September, 1990 to September, 2007 (Tr. 33).  She worked as a nurse
assistant, then a patient care technician, and finally, a unit clerk (Tr. 34).  The technical
position required her to lift over 50 pounds (Tr. 35).  She became a unit clerk after left arm
problems prevented performance of the technical position (Tr. 35).  She was married to a
construction worker (Tr. 33-34).

---

[1]
An earlier administrative hearing was held by video conference from Dallas Texas
(Tr. 62).  The previous ALJ found that Plaintiff could perform her past relevant work (Tr.
15).  The Appeals Council vacated that decision, sending it back to the administrative level
for the taking of vocational testimony, evaluation of Plaintiff's subjective complaints, and
for articulation of the basis for the Residual Functional Capacity Assessment (Tr. 15).

As a child, Plaintiff had two hip surgeries for a congenital hip condition (Tr. 36). The condition did not begin to bother her again until near the end of stint as a technician (Tr. 36). During her time as a technician, she also began experiencing headaches and back, elbow, and neck pain (Tr. 37). Left arm surgery performed four years before the hearing did not alleviate arm problems (Tr. 37). She experienced ongoing left elbow weakness (Tr. 37). She did not experience right arm problems except for right side neck pain radiating into the right extremity (Tr. 38). She experienced nerve damage to the neck (Tr. 39). She also experienced lower back and right hip problems creating difficulty walking (Tr. 39).

Plaintiff currently received treatment from a pain doctor and rheumatologist (Tr. 40). She also experienced depression characterized by mood swings, agoraphobic-like episodes, daily crying spells, and suicidal thoughts (Tr. 40-41). She attended church three times a week, but was unable to sit through a service due to back pain (Tr. 41-42). She ate sporadically and unhealthily, experienced concentrational problems, and slept fitfully (Tr. 42). She had a hernia repair and gallbladder surgery but did not experience current symptoms of those condition (Tr. 42). Plaintiff had previously undergone steroid injections to the left elbow and was currently on Lyrica, Prestiq, Advair, Ibuprofen, and Sulfran (Tr. 43). She experienced drowsiness when taking the medication (Tr. 44). She experienced asthma, but the condition did not prevent her from working (Tr. 46).

Plaintiff was unable to sit for more than 20 minutes without changing positions, stand for 10 minutes, or walk for more than one block (Tr. 46). She was unable to lift even five pounds with the left hand (Tr. 47). Due to tiredness and weakness, she lay down for two

hours every day (Tr. 48).  Due to exertional limitations, she was unable to perform any of her former jobs (Tr. 49).  She would be unable to perform a job where she was allowed to sit due to concentrational problems and her need to change positions (Tr. 49).

She performed household chores with the help of her husband and two sons (Tr. 50). She liked listening to classical music (Tr. 50).  She attempted to improve her mood by praying (Tr. 50).  In addition to the above-mentioned conditions, she had been diagnosed with fluid on the left knee and experienced daily headaches characterized by blurred vision of the right eye (Tr. 51-52).

In response to questioning by her attorney, Plaintiff reported that she could lift five to ten pounds with the right arm (Tr. 52).  She reiterated that she was unable to perform significant lifting with left arm, noting that she had been told that she required left shoulder surgery (Tr. 53).

**B.  Medical Records[2]**

### 1.  Treating Sources

In September, 2007, John K. Anderson, M.D. noted that a recent EMG of the upper extremities was positive for ulnar neuropathy (Tr. 367).  Plaintiff reported that she was unable to lift more than one pound on the left, sit for more than 30 minutes, or stand for more than 10 (Tr. 474).  An MRI of the left shoulder showed possible nerve root impingement but

---

[2]Records predating the September, 2007 alleged onset of disability and records unrelated to the claim for benefits, reviewed in full, have been omitted from the present discussion.

no other abnormalities (Tr. 359-360, 378, 471). Plaintiff reported blurred vision (Tr. 368). Dr. Anderson found Plaintiff "totally incapacitated" on a "permanent" basis (Tr. 371). The same month, Jean C. Scholl, M.D. noted Plaintiff's complaints of "pain everywhere," including the left shoulder, right hip, and legs (Tr. 364). A physical examination was unremarkable except for "obvious pelvic misalignment" (Tr. 364). The following month, Luke Y. Kim, M.D. noted a positive Tinel's sign at the elbow with significant range of motion limitations of the right hip (Tr. 469). He referred Plaintiff for physical therapy (Tr. 469). The following month, Dr. Kim opined that Plaintiff was "somewhat better" after two sessions of physical therapy, advising her to continue the therapy program (Tr. 467). In December, 2007, Raymond C. Noellert, M.D. advised Plaintiff to undergo a sub-muscular transposition of the left ulnar nerve and left carpal tunnel release (Tr. 462).

In January, 2008, Plaintiff experienced significant post-surgery left forearm pain (Tr. 459). Dr. Scholl submitted an opinion letter on behalf of Plaintiff's disability claim, noting recent surgery for nerve damage to the left arm (Tr. 391, 458). Dr. Scholl noted that Plaintiff was currently receiving care from Dr. Anderson for her shoulder and was also seeking treatment for renewed hip problems (Tr. 391). She opined that Plaintiff was unable to return to work "for an indefinite period of time" (Tr. 391). Physical therapy discharge notes from the following month state that Plaintiff experienced "mild improvement" since starting therapy (Tr. 456). Erik Sinka, D.O. examined Plaintiff in May, 2008, noting that Plaintiff's back pain was likely musculoskeletal (Tr. 445). He prescribed Nortriptyline for back pain (Tr. 445). Plaintiff denied increased stress or depression (Tr. 444). The same month, an MRI

of the lumbar spine showed mild to moderate lumbar facet arthropathy but otherwise mild findings (Tr. 438).  The following month, an MRI of the right hip showed no evidence of an acute injury (Tr. 429).  The same month, Plaintiff reported fibromyalgia type symptoms (Tr. 427).  Dr. Scholl's treating records from the next month show that Plaintiff was prescribed Lyrica for the fibromyalgia as well as Motrin 600, and Ultram (Tr. 424).  In August, 2008, Dr. Anderson found that Plaintiff should not lift more than five pounds (Tr. 422).  The following month, Dr. Scholls records state that Plaintiff had been terminated from her position and was pursuing disability benefits (Tr. 420).

In November, 2008, Dr. Noellert examined Plaintiff, noting complaints of continued hand numbness and elbow pain (Tr. 392).  He opined that Plaintiff's condition was "as good as it is going to be," recommending that she cope with discomfort with steroid injections and oral medication (Tr. 392, 418).  He opined that Plaintiff was too young for an elbow reconstruction (Tr. 392).

In January, 2009, Dr. Scholl again opined that Plaintiff was disabled, noting a diagnosis of fibromyalgia (Tr. 417).  In March, 2009, Dr. Anderson opined that Plaintiff was unable to work more than 10 minutes and was unable to sit, stand, climb or crawl (Tr. 416).  Dr. Scholl's May, 2009 records state that Plaintiff's efforts to walk every day were limited by diffuse pain (Tr. 414). A June, 2009 MRI of the brain was unremarkable (Tr. 533).   In July, 2009, Dr. Scholl again encouraged Plaintiff to walk regularly (Tr. 412).

In August, 2009, Dr. Scholl completed a functional questionnaire, finding that in a work setting, Plaintiff was unable to stand or sit for more than 15 minutes at a time as a result

of fibromyalgia, headaches, and hip and arm pain (Tr. 397). She found that Plaintiff could bend, stoop, balance, and perform left side fine manipulations occasionally (Tr. 397-398). Dr. Scholl found that Plaintiff would need to elevate her legs frequently over the course of an eight-hour work day and experienced "severe" pain (Tr. 398). The same month, orthopedic surgeon Mark Kelley, M.D. examined Plaintiff, noting "an obvious limp on the right" due to the right leg being half an inch shorter than the left (Tr. 400). He noted the persence of right hip arthritis and "a chronic deformity from childhood surgery" (Tr. 400). Dr. Kelley opined that Plaintiff would require a right hip reconstruction (Tr. 400). In the "short term," he recommended steroid injections, restrictions on standing and walking, and the continued use of a heel lift (Tr. 400). Dr. Anderson noted the same month that Plaintiff experienced malalignment syndrome of the left knee with mild effusion and crepitus upon extension (Tr. 411). The following month, he opined that Plaintiff was unable to sit or walk for more than 10 minutes (Tr. 546, 548). Also in September, 2009, Dr. Noellert noted the presence of "persistent median neuropathy on the right (Tr. 562). He found that surgery was not advised (Tr. 562).

November, 2009 psychological counseling notes state that Plaintiff experienced domestic problems as a result of her husband's failure to take psychotropic medication (Tr. 551). Dr. Scholl noted that fibromyalgia-related pain was unresponsive to pain medication (Tr. 558). Intake notes from January, 2010 note no history of substance abuse or legal problems (Tr. 553). Herbert Malinoff, M.D. observed "very little . . . pain behavior" (Tr. 554). He recommended small doses of antidepressants (Tr. 555). In May, 2010, Dr.

-7-

Malinoff noted that Plaintiff was able to "perform chores at home in a fairly regular way," but was limited by pain and fatigue (Tr. 593).

In January, 2011, Dr. Scholl noted the diagnoses of fibromyalgia, degenerative joint disease, right hip pain, headache, and left arm pain (Tr. 586). Dr. Scholl found that Plaintiff was disabled from work (Tr. 586). The same month, Dr. Malinoff noted that Plaintiff was currently under the care of a rheumatologist for fibromyalgia (Tr. 587).

### 2. Non-Treating Sources

In December, 2007, Roberta F. Lack performed a Physical Residual Functional Capacity Assessment on behalf of the SSA, finding that Plaintiff could lift 10 pounds frequently and 20 occasionally; sit, stand, or walk for six hours in an eight-hour work day; and push and pull without limitation (Tr. 384). Lack found that Plaintiff could balance, stoop, kneel, crouch, and crawl on a frequent basis, climb stairs/ramps occasionally, but could never climb ladders, ropes, or scaffolds (Tr. 385). Lack found that Plaintiff was limited to occasional overhead reaching with the left arm (Tr. 386). Lack concluded that Plaintiff should avoid "even moderate exposure" to temperature extremes, witness, humidity, vibration, and fumes, odors, dusts, and gases (Tr. 387). Plaintiff was precluded from all exposure to hazards such as machinery or heights (Tr. 387).

In January, 2009, neurologist Allan G. Clague, M.D. performed a consultative examination on behalf of Plaintiff Workers' Compensation and DIB claims, finding weakness of the hamstring muscles as a result of hip problems (Tr. 395). Plaintiff demonstrated a limp in the right lower extremity, back spasms, and tenderness of the right

-8-

forearm (Tr. 395).  Dr. Clague found that Plaintiff was "totally disabled" from all gainful employment (Tr. 395).

In January, 2010, Thomas T. L. Tsai, M.D. performed a Psychiatric Review Technique, finding mild limitations in activities of daily living, social functioning, and concentration, persistence, or pace (Tr. 564, 574).  He found that Plaintiff's mental conditions were "non-severe" (Tr. 576).  A second Physical Residual Functional Capacity Assessment performed in April, 2010 found that Plaintiff could could lift 10 pounds frequently and 20 occasionally; sit, stand, or walk for six hours in an eight-hour work day; and push and pull without limitation (Tr. 579).  Paula Pendergast found that Plaintiff could could balance, stoop, kneel, crouch, and crawl on a frequent basis, climb stairs/ramps occasionally, but never climb ladders, ropes, or scaffolds or overhead reach with the left arm (Tr. 580-581).  Pendergast also found that Plaintiff should avoid "even moderate exposure" to temperature extremes, witness, humidity, vibration, and fumes, odors, dusts, and gases but found no limitations in working with hazards such as machinery or heights (Tr. 582).

### 3.  Evidence Submitted After the ALJ's June 24, 2011 Decision[3]

---

[3]

Material submitted subsequent to the administrative decision is subject to a narrow review by the district court. *Cotton v. Sullivan,* 2 F.3d 692, 696 (6th Cir.1993).  To establish grounds for remand based on such material, the claimant must show that the "new evidence is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding ..." 42 U.S.C. § 405(g).

Plaintiff has not provided "good cause" for the late submission of this material. Further, a number of records merely duplicate those reviewed by the ALJ.  Other records, while new, restate a number of the same observations already made by various treating

A March, 2010 MRI of the cervical spine showed moderate right foraminal compromise at C5-C6 (Tr. 616).  The following month, a bone density scan was within normal limits (Tr. 618-619).  A September, 2010 bone scan showed "no abnormalities" of the right hip  (Tr. 613).  Dr. Scholl's December, 2010 records state that Plaintiff was unable to continue medication for fibromyalgia due to financial constraints (Tr. 625).  In March, 2011, Patrick Gibbons, D.O. reported that Plaintiff was currently receiving treatment for major depression "in [the] context of chronic pain syndrome" since October, 2010 (Tr. 599).

### C.  Vocational Testimony

VE Luann Castellana classified Plaintiff's former job as a nurse aide as semiskilled and exertionally medium[4] (exertionally heavy as performed); and unit clerk, semiskilled/light (Tr. 55).  She found that the nursing skills were transferrable to the light work of a home health aide or "companion type job" (2,500 jobs in the local economy) and the unit clerk position was transferrable to the sedentary clerical positions of receptionist or appointment

_____

sources.  While as noted below, Plaintiff has established grounds for a remand, she cannot show that the newly submitted evidence would be likely to change the ALJ's decision.

[4]

20 C.F.R. § 404.1567(a-d) defines *sedentary* work as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools;  *light* work as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds;" *medium* work as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and that exertionally *heavy*  work "involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds.  *Very Heavy* work requires "lifting objects weighing more than 100 pounds at a time with frequent lifting or carrying of objects weighing 50 pounds or more. § 404.1567(e).

clerk (4,000) (Tr. 55).  Taking into account Plaintiff's age, education, and work experience,

the ALJ then posed the following hypothetical question to the VE:

> [A]ssume that such a person has exertional limitation of lifting 20 pounds
> occasionally, 10 pounds frequently.  We have standing, sitting, walking, six
> hours.  No reaching overhead with the left upper extremity, occasional
> handling, fine and gross manipulation with the left hand. Occasional climbing
> ramps and stairs, no climbing ladders, ropes, and scaffolds.  Jobs that would
> avoid concentrated exposure to respiratory irritants, hazards, vibration,
> extreme temperatures, wetness and humidity.  Jobs that would avoid a person
> with close vision.  And jobs that would provide for routine production and
> stress. Putting this individual at the unskilled level, could such a person be
> expected to perform the claimant's past relevant work? (Tr. 57).

The VE responded that given the hypothetical limitations, the individual would be

unable to perform Plaintiff's past relevant work but could perform the light, unskilled work

of a sales counter and rental clerk (4,000); inspector and sorter (1,000); and entrance control

worker (1,500) (Tr. 59).   The VE testified further that if the same individual were  limited

to "lifting five pounds occasionally," "no standing or sitting [and] occasional reaching above

the left shoulder, occasional handling, fine and gross manipulation with the left hand,

occasional bending, balancing, stooping, no exposure to respiratory irritants and hazards,

[and] avoidance of moderate exposure to extreme temperatures . . . accommodation for close

vision . . . routine production and stress and simple job assignments," no work would be

available (Tr. 60).  VE also testified that the need to lie down for two hours at unpredictable

intervals would preclude all gainful employment (Tr. 60).  She concluded by  stating that her

testimony was consistent with the information found in the Dictionary of Occupational Titles

(Tr. 61).

-11-

### D.  The ALJ's Decision

Citing the medical records, ALJ Perez found that Plaintiff experienced the severe impairments of "left hand carpal tunnel syndrome; a left arm condition, including an elbow condition; a left shoulder condition; right hip pain; low back pain; and asthma," but that none of the conditions met or equaled a listed impairment found in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Tr. 17-18).  The ALJ determined that Plaintiff had the  Residual Functional Capacity ("RFC") for light work with the following additional restrictions:

> Claimant can lift 10 pounds frequently and 20 pounds occasionally; she can sit for six hours in an eight-hour work day, stand for six hours in a work day, and walk for six hours in a work day; she cannot climb ladders, scaffolds, or ropes; she can occasionally climb ramps or stairs; she cannot reach overhead with the left upper extremity; she can engage in occasional handling and fine and gross manipulation with the left hand; she must avoid concentrated exposure to respiratory irritants, dangerous machinery, unprotected heights, temperature extremes, vibration, wetness, and humidity; she is limited to jobs that do not require the ability to see far distances; and she is limited to unskilled work with routine production and stress (Tr. 18).

Citing the VE's testimony, the ALJ determined that although Plaintiff was unable to perform her past relevant work, she could work as a sales counter/rental clerk, inspector/sorter, and security/entrance control worker (Tr. 23).

The ALJ rejected Plaintiff's allegations of limitations, noting that she did not use narcotic pain medication on a regular basis (Tr. 20).  He cited treating source recommendation to engage in physical exercise and "volunteerism" (Tr. 2).  The ALJ rejected Dr. Scholl's August, 2009 and January, 2011 disability opinions based on Plaintiff's greater estimation of her own physical abilities (Tr. 21).

-12-

2:13-cv-10813-AJT-RSW   Doc # 20   Filed 02/28/14   Pg 13 of 21   Pg ID 778

III.    STANDARD OF REVIEW

The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence.  42 U.S.C. §405(g); *Sherrill v. Secretary of Health and Human Services,* 757 F.2d 803, 804 (6th Cir. 1985).  Substantial evidence is more than a scintilla but less that a preponderance.  It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)).  The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen,*  800 F.2d 535, 545 (6th Cir. 1986)(en banc).  In determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ. *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

## IV.    FRAMEWORK FOR DISABILITY DETERMINATIONS

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected

-13-

to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy.  20 C.F.R. §416.920(a).  The Plaintiff has the burden of proof at steps one through four, but the burden shifts to the Commissioner at step five to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984).

## V.  ANALYSIS

### A.  The Treating Physician Analysis

Plaintiff argues first that the ALJ erred by rejecting Dr. Scholl's  disability opinions. *Plaintiff's Brief,* 3-10, *Docket #14*.   She contends that the ALJ failed to articulate his reasons for the rejection.  *Id.* at 4 (citing 20 C.F.R. § 404.1527).

An opinion of limitation or disability by a treating source is entitled to deference. "[I]f the opinion of the claimant's treating physician is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, it must be given controlling weight." *Hensley v. Astrue,* 573

F. 3d 263, 266 (6th Cir. 2009)(internal quotation marks omitted)(*citing Wilson v. Commissioner of Social Sec.* 378 F.3d 541, 544 (6th Cir. 2004). Further,

> [i]f the opinion of a treating source is not accorded controlling weight, an ALJ must apply certain factors--namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source--in determining what weight to give the opinion.

*Wilson,* at 544 (citing 20 C.F.R. 404.1527(c)(2-6)).

The failure to provide "good reasons" for rejecting a treating physician's opinion constitutes reversible error. *Gayheart v. Commisioner of Social Security,* 710 F. 3d 365, 376 (6th Cir. 2013)(citing *Wilson,* at 544-446). "[T]he Commissioner imposes on its decision-makers a clear duty to 'always give good reasons in our notice of determination or decision for the weight we give [a] treating source's opinion.'" *Cole v. Astrue* 661 F.3d 931, 937 (6th Cir.2011); § 404.1527(c)(2). "These reasons must be 'supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Gayheart,* at 376 (citing SSR 96-2p, 1996 WL 374188, *5 (1996)).

The ALJ purportedly rejected Dr. Scholl's opinion for two reasons, first on the basis that Plaintiff "testified to a greater residual functional capacity than Dr. Scholl provide[d]" (Tr. 21). However, Plaintiff's testimony that she was able to sit for 15 to 20 minutes (Tr. 46) is not inconsistent with Dr. Scholl's finding that Plaintiff was unable to stand or sit for 15 minutes (Tr. 397). On the same page, Dr. Scholl found that Plaintiff was unable to

perform any standing or sitting during the *work day*. A reasonable interpretation of the discrepancy would be that Dr. Scholl was emphasizing that her patient was unable to perform any work because of a persistent inability to sit or stand for any reasonable length of time.

Second, the ALJ found that the same "internal inconsistency" in the treating physician's opinion undermined the entire assessment. However, again, the "inconsistencies" simply appear to be reiterating Dr. Scholl's longstanding opinion that Plaintiff was capable of limited functional activity but not gainful employment. Because neither of the ALJ's reasons for the rejection constitute "good reasons," remand on this basis is appropriate.

The weakly supported treating physician analysis is accompanied by other questionable findings. For example, the ALJ cited Dr. Noellert's November, 2008 finding that one year after elbow surgery, Plaintiff showed good rotation, had reached "maximum medical improvement," and that additional surgery was not advised (Tr. 21). However, in citing certain portions of the report, the ALJ omits other portions of the same report that state that Plaintiff continued to experience symptoms of nerve damage and continuing discomfort (Tr. 392). While the ALJ cited the statement that additional surgery was not advised, it does not follow that the condition had resolved. Dr. Noellert merely found that additional surgery would not improve Plaintiff's ongoing elbow problems and instead, recommended the use steroid injections for pain relief (Tr. 392).

Likewise, while treating physician Dr. Anderson opined on several occasions that Plaintiff was unable to work (Tr. 371) (unable to work indefinitely); (Tr. 422)( unable to lift

-16-

more than five pounds); (Tr. 416)(unable to walk for more than 10 minutes), Anderson is not mentioned in the administrative opinion. The ALJ's failure to address a treating opinion of disability, standing alone, constitutes reversible error. *Wilson, supra,* at 544. The omission is of even greater concern here where Dr. Anderson's opinion strongly supports Dr. Scholl's assessments.

### B. The RFC

Plaintiff also argues that the ALJ gave short shrift to her well documented conditions of depression, anxiety, and fibromyalgia. *Plaintiff's Brief* at 10-15. She argues that in crafting the RFC, the ALJ failed to perform a function-by-function evaluation of her work related abilities. *Id.* (citing SSR 96-8p).

SSR 96–8p requires that "[t]he RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions in paragraphs (b), (c), and (d) of 20 C.F.R. §§ 404.1545 and 416.945." The analysis of the physical functions is governed by § 404.1545 which pertains to "sitting, standing, walking, lifting, carrying, pushing, [and] pulling" as well as "manipulative or postural functions, such as reaching, handling, stooping or crouching." *Id.*

While Plaintiff argues that the ALJ minimized her limitations as a result of depression and anxiety, his finding that the conditions did not create more than minimal limitations is supported by substantial evidence, including a Psychiatric Review Technique showing only mild psychological limitations (Tr. 564, 574). To be sure, counseling records show some

degree of psychological distraction as a result of domestic problems and stressors related to physical conditions (Tr. 553, 558). However, the same records show that Plaintiff appeared fully oriented and did not experience significant social limitations or substance abuse or legal problems.

In contrast, the ALJ gave impermissibly short shrift to the alleged limitations stemming from fibromyalgia. While the administrative opinion contained an fairly adequate discussion of the imaging studies, fibromyalgia does not lend itself to a diagnosis by these means. The absence of imaging studies or other "objective" evidence does not imply that Plaintiff did not experience significant limitations as a result of the condition. As such, the ALJ's observation that neurological studies were negative is irrelevant to whether Plaintiff's allegations of pain and fatigue were credible (Tr. 20). "Given the nature of fibromyalgia, where objective evidence is elusive and subjective complaints are central to diagnosis and treatment, providing justification for discounting a plaintiff's credibility is particularly important." *Castro v. Commissioner of Social Sec.,* 2013 WL 4012824, *12 (E.D.Mich. August 6, 2013)(Binder, M.J)(citing *Kalmbach v. Comm'r of Soc. Sec*., 409 F. App'x 852, 863–64 (6th Cir. January 7, 2011). Further, while the record before the ALJ contained dozens of references to the condition by treating sources as well as the medication prescribed for the condition, (Tr. 558, 586-587) *see also Plaintiff's Brief* at 13-14, the ALJ cited only one record stating that Plaintiff's pain was "reasonably well controlled" with medicine (Tr. 20). Because the ALJ erred by failing to acknowledge the fibromyalgia diagnosis at either Step Two or in the RFC, remand on this basis is also appropriate.

-18-

2:13-cv-10813-AJT-RSW   Doc # 20   Filed 02/28/14   Pg 19 of 21   Pg ID 784

**C.  The Credibility Determination**

Finally, Plaintiff argues that the credibility determination, like the treating physician analysis, relies on a distorted view of the record.  *Plaintiff's Brief* at 15-17.  Plaintiff faults the ALJ relying on obscure portions of the treating records in support of the non-disability finding while ignoring the great weight of evidence supporting the opposite conclusion.  *Id.*

Plaintiff is correct that the credibility determination is not wholly supported.  As discussed in the previous section, the ALJ's rejection of the allegations of significant fibromyalgia symptoms is based on isolated portions of the record.  While the ALJ did not err in finding that the mental conditions were non-severe, I am troubled by the ALJ's distortion of Dr. Noellert's November, 2008 findings (Tr. 20-21, 392), the failure to address Dr. Anderson's disability opinions, and the weak reasons supplied for rejecting Dr. Scholl's findings.  Remand is appropriate on this basis, notwithstanding the "great weight" generally accorded an ALJ's crediblity determination, *Cruse v. Commissioner of Social Sec.,* 502 F.3d 532, 542 (6th Cir.2007).

For all of these reasons, a remand is required.  However, because the present transcript does not establish an "overwhelming" case for disability, the errors discussed herein, while critical, do not automatically entitle the Plaintiff to an award of benefits.  *Faucher v. Secretary of Health and Human Services*, 17 F.3d 171 (6th Cir. 1994). Accordingly, the case should be remanded to the administrative level for further proceedings consistent with this opinion.

## VI.   CONCLUSION

For these reasons, I recommend that Defendant's Motion for Summary Judgment be DENIED and that Plaintiff's Motion for Summary Judgment be GRANTED to the extent that the case be remanded for further administrative proceedings.

Any objections to this Report and Recommendation must be filed within 14 days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).  Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within 14 days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than 20 pages in length unless by motion and order such page limit is extended by the court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.


Dated: February 28, 2014                    s/R. Steven Whalen                                    
                                            R. STEVEN WHALEN
                                            UNITED STATES MAGISTRATE JUDGE

I hereby certify that copy of the foregoing document was sent to parties of record on February 28, 2014, electronically and/or by U.S. mail.

s/Michael Williams
Case Manager for the
Horable R. Steven Whalen